

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP/ICR/NCG
F. #2020R00785

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 14, 2022

By ECF

The Honorable Cheryl L. Pollak
Chief United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: United States v. Mohammad David Hashimi, et al.
       Magistrate Docket No. 22-1323 (CLP)

Dear Chief Judge Pollak:

  The government respectfully submits this letter requesting that the Court enter a permanent order of detention for defendants Mohammad David Hashimi ("Hashimi"), Abdullah At Taqi ("Taqi"), and Seema Rahman ("Rahman"). All three defendants were arrested earlier today, Hashimi at his home in Potomac Falls, Virginia, Taqi at his home in Elmhurst, Queens, New York, and Rahman at her home in Edison, Virginia. Hashimi is expected to make his initial appearance today before a U.S. Magistrate Judge in the Eastern District of Virginia, while Taqi and Rahman are scheduled to be presented before Your Honor today, in the above-captioned case.[1]

  The defendants are charged by complaint with conspiring to provide material support, including property and services, including currency and monetary instruments, to the foreign terrorist organization the Islamic State of Iraq and al-Sham ("ISIS"). As set forth in greater detail below, the defendants raised and contributed more than $35,000 to an individual (identified as Facilitator-1 in the Complaint) who represented that he was providing money to ISIS fighters. The overwhelming majority of this money was given through cryptocurrency to a Bitcoin wallet controlled by Facilitator-1, who was located in the Palestinian Territories. In addition to cryptocurrency transactions, the defendants also collected money for and transferred money to Facilitator-1 through other means, including through GoFundMe fundraising campaigns, and PayPal and Western Union wire transfers, that demonstrate a pattern of activity intended to conceal the true purpose and intended beneficiaries of the funds transfers. Indeed, the publicly accessible fundraising links described efforts to raise money for humanitarian purposes, but, as Facilitator-1 told a confidential human source, the charitable descriptions in the fundraising campaigns were in fact a "deception for the infidels" and the "words that are in the link are fake in order to deceive."

---

[1] A fourth defendant, Khalilullah Yousuf, was arrested in Canada earlier today.

In fact, as the defendants believed, the funds they were contributing were intended as contributions for fighters fighting on behalf of ISIS.

For the reasons detailed herein, the Court should enter a permanent order of detention because the defendants present a danger to the community and a serious risk of flight.[2]

I. The Facts

    A. The Defendants

Mohammad David Hashimi ("Hashimi") is a 35-year-old male who resided in Staten Island, New York from approximately July 2020 to the summer of 2021. Hashimi currently lives in Potomac Falls, Virginia. Abdullah At Taqi ("Taqi") is a 23-year-old male residing in East Elmhurst, Queens, New York. Seema Rahman ("Rahman") is a 25-year-old female residing in Edison, New Jersey.

    B. Background on the Islamic State of Iraq and al-Sham

ISIS is a foreign terrorist organization that, since 2013, has conducted terrorist attacks as part of ISIS's goal of forming an Islamic state or "caliphate." At various times over the past few years, ISIS has controlled territory in Syria, Iraq, and Libya, and maintained presences in other countries as well, such as Yemen, Afghanistan, and elsewhere.

ISIS routinely carried out killings and deliberate targeting of civilians; mass executions; persecution of individuals and communities on the basis of their religion, nationality, or ethnicity; kidnapping of civilians; forced displacement of Shia Muslim communities and minorities; killing and maiming of children; rape; and other forms of sexual violence. ISIS recruited thousands of foreign fighters—i.e., non-Syrians and non-Iraqis—from around the globe to assist with its efforts to expand its caliphate in Iraq and Syria. ISIS also leveraged technology—including the internet, social media, and encrypted communications platforms—to spread its violent extremist ideology and for the purposes of inciting adherents to commit terrorist acts. Tens of thousands of extremists have traveled to the Middle East to join ISIS.

ISIS has also claimed credit for numerous terrorist activities, including attacks against Americans in the United States and against Westerners abroad. Specifically, ISIS supporters have claimed responsibility for, among others, the following attacks in the United

---

[2] Detailed herein is a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings). This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at a detention hearing or trial. Where the content of statements, documents, or written communications are described herein, they are done so in pertinent part and in sum and substance, except where quoted or otherwise indicated.

States: the May 2015 shooting in Garland, Texas, at an exhibition featuring cartoons of the Prophet Mohammed; the December 2015 shooting in San Bernardino, California, at the Inland Regional Center; the June 2016 shooting in Orlando, Florida, at the Pulse nightclub; the October 2017 West Side Highway truck attack; and the December 2017 attempted bombing of the 42 Street-Port Authority Bus Terminal. ISIS supporters have also continued to publicly express their desire to continue to target and attack the United States and other Western nations.

ISIS and its supporters have also claimed responsibility for many violent attacks in Europe, South Asia, and Oceania as well, including: the November 2015 shootings and suicide bombings in Paris, France, at the Bataclan concert hall, a sports stadium, and several restaurants; the July 2016 attack upon the Holey Artisan Bakery in Dhaka, Bangladesh, an attack claimed by ISIS, in which more than 25 people, including at least one United States citizen, were killed; the July 2016 truck attack in Nice, France during Bastille Day celebrations; the December 2016 truck attack in Berlin, Germany at a Christmas market; the May 2017 suicide bombing in Manchester, United Kingdom at a concert; the August 2017 van attack in Barcelona, Spain; an August 2018 suicide bombing in Kabul, Afghanistan; the April 2019 Easter Sunday bombings in Sri Lanka that killed or wounded more than 700 people; the August 2021 suicide bombing attack at the Kabul airport that killed more than 180 people, including thirteen members of the United States military; the September 2021 ISIS-claimed stabbing attack in New Zealand; the November 2021 shooting and suicide bombing attack at a military hospital in Kabul that killed 25 people; the March 2022 ISIS-claimed shooting and suicide bombing attack at a mosque in Peshawar, Pakistan, that killed or wounded more than 250 people; and the September 2022 suicide bombing attack at the embassy of the Russian Federation in Kabul, in which approximately ten people were killed.

Notwithstanding the degradation of its former strongholds in Syria and Iraq, as the grim summary of ISIS-claimed attacks across the last decade makes clear, ISIS remains a potent and dangerous FTO.

ISIS has released multiple audio and video messages purporting to be from its then-leader, Abu Bakr al-Baghdadi, advocating continued violence by ISIS supporters. On June 29, 2014, ISIS released an audio recording declaring a "caliphate" consisting of territory under ISIS control in Iraq and Syria, and stating that Baghdadi would be the "caliph" or "leader for Muslims everywhere." On July 5, 2014, ISIS released a video recording in which Baghdadi urged Muslims from across the world to "do jihad in the cause of God, incite the believers and be patient in the face of this hardship." ISIS members and associates produced and disseminated recruiting materials and propaganda encouraging others to travel to the Middle East to fight for ISIS and encouraging those who were unable to travel to instead conduct attacks in their home countries. For example, on or about September 21, 2014, ISIS spokesperson Abu Muhammad al-Adnani called for attacks against citizens—civilian or military—of the countries participating in the U.S.-led coalition against ISIS. On or about March 31, 2015, ISIS recruiter Junaid Hussain commanded ISIS supporters around the world to "rise up." In a post on Twitter, Hussain stated: "Lone Wolfs Rise Up"; "If you can't make the hijrah [travel to ISIS-controlled territory], dont sit at home & give up . . . ignite a bomb, stab a kaffir [nonbeliever or non-Muslim], or shoot a politician!"; "if you came here, you'd be on the frontline fighting, right? But u couldn't come here, so why not fight the kuffar over there?"; and "i always see in the media brothers getting caught making hijrah,

brothers know that your jihad is not over just because you got stopped."  On May 14, 2015, ISIS released an audio recording in which Baghdadi urged Muslims to take up arms on behalf of ISIS by either traveling to the Middle East to fight for ISIS or launching attacks wherever they were.  On September 29, 2017, ISIS released an audio recording in which Baghdadi again urged his followers to continue to attack the United States and its allies, saying: "Carry on your jihad and your blessed operations.  Let not the crusaders enjoy life in their homelands while your brothers are subjected to bombardment and destruction."

    C.    <u>Overview of the Conspiracy</u>

As set forth in the Complaint, Hashimi and Yousuf were members of a group chat (referred to in the Complaint as Group Chat-1) on an encrypted social media and mobile messaging electronic communication service that facilitated communication between and among supporters of ISIS and other groups that adhered to similar violent jihadist ideologies.  In early April 2021, members of Group Chat-1 discussed posting links to online fundraising and money transfer platforms that purported to be for humanitarian causes but that were in fact intended to help the "mujahideen," an Arabic term that translates to "holy warriors" and that is used by ISIS supporters to refer to ISIS fighters.  Yousuf provided a link to a specific Bitcoin address and another member of Group Chat-1 posted a link to a PayPal campaign, both of which were controlled by an individual identified in the Complaint as Facilitator-1.

In conversations with a confidential human source, both Taqi and Facilitator-1 discussed giving money to support ISIS fighters.  When the confidential source asked Facilitator-1 for proof that the money being donated was going to support ISIS, Facilitator-1 sent the confidential source screenshots and a video depicting tactical gear, ammunition, and grenades on top of an ISIS flag.  An image of one of the photographs is depicted below.



Facilitator-1 also told the confidential source that the charitable descriptions in the online fundraising campaigns were in fact a "deception for the infidels" and the "words that are in the link are fake in order to deceive."

Between February 2021 and July 2022, the defendants collected and contributed more than $35,000 to Facilitator-1 via a combination of cryptocurrency and other transfers. The defendants contributed more than $24,000 to Facilitator-1's Bitcoin address, with Yousuf contributing $20,347.89, Taqi contributing $2,769.35, and Rahman contributing $927.51. The defendants also sent more than $1,000 in money transfers to the PayPal account associated with Facilitator-1, with Rahman contributing approximately $550, Taqi contributing approximately $480, and Hashimi contributing $55. In addition, both Rahman and Yousuf created multiple GoFundMe fundraising campaigns purporting to collect money for charitable causes. Hashimi contributed $364 and Taqi contributed $200 through the GoFundMe campaigns created by Yousuf, while Rahman collected approximately $10,000 through the GoFundMe campaigns that she created, and then wired the proceeds, approximately $10,024, to individuals connected to Facilitator-1 via Western Union.

II.     Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141, et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged, including whether the offense is a "crime of violence"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g).

For certain offenses, including the material support conspiracy charge contained in the complaint, the law presumes that there is no set of conditions that will reasonably assure the defendant's appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3)(C). This presumption may be rebutted by the defendant, provided the defendant is able to present evidence that they are neither a danger nor a risk of flight. See United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Even upon such a showing, however, the presumption in favor of detention "does not disappear entirely, but remains a factor to be considered among those weighed[,]" id., because it "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial" and "represents Congressional findings that certain offenders . . . are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions." United States v. Stone, 608 F.3d 939, 945-46 (6th Cir. 2010) (internal quotation marks and citation omitted) (ellipsis in original).

III.     The Court Should Enter Permanent Orders of Detention

As detailed below, each of the applicable Bail Reform Act factors weighs heavily against pretrial release and in favor of upholding the presumption of detention; the defendants present both a grave danger to the community and a substantial risk of flight if released on bond. Accordingly, the Court should enter permanent orders of detention pending trial. Below, the government addresses the factors as to each of the defendants individually.

**Mohammad David Hashimi**

A.     The Nature and Circumstances of the Offense Charged

The charged offenses and the circumstances surrounding them are extraordinarily serious. These considerations demonstrate that the defendant would pose an acute danger if released and, consistent with the Bail Reform Act, he must be detained pending trial to ensure the safety of the community.

As detailed in the Complaint, Hashimi both contributed funds to ISIS through Facilitator-1 and shared links with other members of Group Chat-1 to enable them to transfer funds to Facilitator-1. From on or about March 8, 2021, through on or about March 29, 2021, Hashimi made four transfers, in which he sent a total of approximately $364 to the "Ramadan Appeal for Gaza" fundraising campaign created by Yousuf to collect funds for Facilitator-1. Hashimi also sent $55 directly to Facilitator-1's PayPal account on May 11, 2021.

In addition to his financial support, Hashimi has also regularly shared extremist literature and speeches, made statements in social media through accounts that he did not register in his own name expressing support for ISIS and disseminated ISIS propaganda. Moreover, as detailed in the Complaint, through its investigation the government has obtained numerous messages in which the defendant has expressed support for or justified violent terrorist acts committed by ISIS. For example, in an August 27, 2021 direct message conversation with another individual about the terrorist suicide bombing at the Kabul Airport claimed by ISIS-K that resulted in the deaths of a number of U.S. soldiers and Afghan civilians, Hashimi stated "War is not pretty" "And people want to establish the rules and conditions of jihad on the mujahideen when the Kuffar have violated every way possible" "This Ummah is one body, people need to stop thinking in terms of one arena" "Kuffar blood is halal."

Hashimi has also made statements suggesting his desire to die in combat for, or in a terrorist attack carried out on behalf of, a foreign terrorist organization, and conducted searches for explosives and firearms. For example, in November 2020, Hashimi told a confidential source that over encrypted communications that "I have made up my mind I want to make Hijra to Afghanistan. To join dawla," in other words, travel to join ISIS. In or about September 2021, Hashimi told another individual through a direct message that "I just want Jannah," i.e., paradise or the afterlife, "And to die on the battlefield." More concerning still, evidence detailed in the Complaint indicates that on or about July 25, 2021, near in time to these statements, Hashimi

6

searched the Internet for "guns in virginia" and "gun shop northern virginia" and visited the website of a northern Virginia gun store.

Taken together, Hashimi's financial contributions to ISIS, his dissemination of its propaganda, his statements justifying its violent terrorist acts, and his statements expressing his own desire to join ISIS himself and die in violent jihad make clear that Hashimi's membership in the conspiracy to support ISIS is a particularly serious offense because he shares the terrorist organization's violent goals and ideology.

B.    The Weight of the Evidence

The weight of the evidence in this case is overwhelming. The government's evidence consists of, among other things, Hashimi's statements made in Group Chat-1 and other private group chats that, unbeknownst to the defendant and his coconspirators, were monitored by confidential human sources working at the direction of the FBI. The government has also obtained statements made by Hashimi in direct message conversations and in public postings on social media accounts whose connection to himself Hashimi has attempted to conceal. Financial records obtained by the government evidence Hashimi's contributions to ISIS, and together with other records of electronic communications providers confirm that he is the person communicating with co-conspirators in furtherance of the conspiracy and disseminating ISIS propaganda.

Moreover, Hashimi has repeatedly made statements to co-conspirators and others evidencing his knowledge that he faces criminal liability for his actions. For example, the government has obtained communications in which Hashimi questions whether those with whom he is communicating are "feds," and others in which he warns co-conspirators to be careful in their discussions about sending Bitcoin to the "mujahideen" through Facilitator-1's Bitcoin address because they cannot be certain who is watching. The Complaint details a particularly revealing exchange between Hashimi and Rahman in August and September 2021, in which Rahman warns Hashimi that her parents are threatening to report her to law enforcement for supporting terrorists and notes that they hold Hashimi responsible for radicalizing her. As detailed in the Complaint, Hashimi responded to these concerns by instructing Rahman to "lie to protect me from harm" "just lie if you have to." In other communications during this exchange, Hashimi further advised Rahman not to tell her parents that she supported particular "groups," in a reference to ISIS, but rather to discuss her "creed," in a reference to her extremist beliefs, as a way to avoid implicating herself in criminal activity.

Hashimi's advice to Rahman mirrors advice Hashimi has given to others. For example, the government has obtained evidence that in an electronic communications exchange on or about June 24, 2021, Hashimi warned another individual "Just don't glow in DMs" "With anyone" "You're asking for jail time," using a slang term ("glow") that refers to online statements that are facially incriminating and likely to attract the attention of law enforcement. In the same exchange, Hashimi counseled the other individual about how to be careful in his communications, writing: "Don't support IS," referring to ISIS, but instead "Support Khilafah," meaning "Caliphate," explaining "Like don't be so obvious". When the individual responded "Oh" "Fax" "Khilafah is less obvious", Hashimi agreed, writing "Yes" "Support the creed" "Not groups" "That

7

becomes obvious" "When the creed is crystal clear". As Hashimi's statements in this exchange make clear, Hashimi conceals expressions of support for ISIS using coded language, i.e., by discussing his "creed" in a "crystal clear" way that makes his support for ISIS "obvious" to other ISIS supporters who understand ISIS's connection to the extremist views that Hashimi expresses, all to avoid drawing the attention of law enforcement to his actions.

Thus, Hashimi's communications reflect that he is typically careful not to make explicit statements of support for designated foreign terrorist organizations because he understands that doing so will draw the attention of law enforcement to his actions, and he has even directed other coconspirators to lie on his behalf.

C.  Hashimi's History and Characteristics and The Danger to the Community Posed by His Release

Hashimi presents a danger to the community and a serious risk of flight that cannot reasonably be mitigated by release on conditions. As detailed below, factors that in another case might ordinarily weigh in favor of pretrial release on conditions only underscore the need in this case to order Hashimi detained pending trial.

The government's investigation has revealed that—until this point—Hashimi has led a double life. In one part of his life he is a skilled worker who holds a well-paying job in information technology and lives alone in an apartment building in a gated community. But at the same time, Hashimi runs several social media accounts under false names that he uses to disseminate ISIS propaganda, spends considerable time translating and disseminating the teachings of well-known extremists to extend their radicalizing influence to others, and actively participates in group chats on an encrypted electronic communications platform that discuss the members' support for violent jihad and ISIS. Hashimi also acts on his support for ISIS by contributing money through Facilitator-1, and has repeatedly contemplated taking a further far more dangerous step—making hijrah to ISIS-controlled territory to fight and die on the battlefield in service to ISIS's violent ideology.

Hashimi's arrest earlier this morning pierced the deception through which he has concealed his support for a violent terrorist organization behind a law-abiding façade, and has made clear to him that, despite his best efforts, his actions in support of ISIS have not gone unnoticed by law enforcement. Hashimi now faces the consequences that he has long been careful to avoid—criminal prosecution on a terrorism charge that carries a statutory maximum term of 20 years' imprisonment, see 18 U.S.C. § 2339B(a)(1), and for which the Sentencing Guidelines would recommend a term of 360 months' to life imprisonment. See U.S.S.G. §§ 2M5.3(a) (base offense level 26), (b) (two level enhancement), and 3A1.4 (terrorism enhancement: 12 offense level increase, and criminal history category VI). Given the significant weight of the evidence against him, Hashimi would have a powerful incentive to flee from prosecution rather than face conviction at trial. See, e.g., United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that [the defendant]'s Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."); see also United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) ("[A] district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee."). Thus

while Hashimi has previously made statements to others, including those to Rahman quoted in the Complaint, indicating that he was keeping a low profile to avoid being caught by law enforcement because of his "responsibilities", his arrest this morning will have shown Hashimi that this strategy has failed.

If Hashimi is released on conditions pending trial, there is little reason to believe that the past law-abiding life that he used to conceal his actions in support of ISIS would do anything to restrain him from actions that endanger the public. Indeed, now that Hashimi knows that law enforcement has been accumulating evidence against him, he may reasonably conclude that pretrial release would present him with his last opportunity to attempt hijrah to ISIS-controlled territory or to conduct a terrorist attack on behalf of ISIS that could provide him the martyr's death that he has previously said is his goal. Particularly in light of the presumption of detention that attaches to the serious offense with which Hashimi has been charged, the government submits that there are no conditions and no combination of conditions of release that would reasonably protect the community from the danger that Hashimi represents, or assure his appearance as required.

**Abudullah At Taqi**

    A.    <u>The Nature and Circumstances of the Offense Charged</u>

Taqi played a central role in the extraordinarily serious events of the charged conspiracy. He began messaging with a confidential human source (identified as CHS-1 in the Complaint) in October 2021 and into 2022 and introduced CHS-1 to Facilitator-1. Taqi conveyed to CHS-1 that he was using cryptocurrency to anonymize his funding to supporters of ISIS, which he sent through "brothers"; he told CHS-1, "I've used [crypto] to send sadaqah [charity]. Its good to send money unnoticed." Taqi stated further, "Im just trying to give the little amount of support I can akhi [friend/brother]. Sadly the brother through whom I used to send money I lost his contact since it was on" an older account. Taqi later told CHS-1 that he had gotten back in touch with the "brother" through whom he had been sending cryptocurrency and assured CHS-1 that the brother was from "Dawlah." "Dawlah" is a term for ISIS.

In introducing CHS-1 to Facilitator-1, Taqi informed CHS-1 that he had confirmed CHS-1 was trustworthy to the "brother," and conversely, he vouched for the "brother" to CHS-1, indicating that he had vouched for each individual's support for ISIS. CHS-1 and the "brother," Facilitator-1, then began communicating, and Facilitator-1 confirmed to CHS-1 that Taqi regularly sent him money for two years before Taqi's bank account was suspended. CHS-1 then contributed funds to Facilitator-1 through the same cryptocurrency wallet to which Taqi had sent funds, and Facilitator-1 sent CHS-1 various forms of corroboration that CHS-1 was giving Facilitator-1 money destined for ISIS, including multiple screenshots and one video of weapons, including firearms and grenades, on top of an ISIS flag. Between May 2021 and March 2022, Taqi contributed approximately $2,769.35 to Facilitator-1's Bitcoin address through 15 different transactions from Taqi's cryptocurrency account.

Prior to sending cryptocurrency to Facilitator-1's Bitcoin wallet, Taqi also sent funds to Facilitator-1 via PayPal, contributing approximately $480. As noted above, Taqi has also contributed approximately $200 to GoFundMe campaigns created by Yousuf that purported to

raise money for needy families but in fact provided funds to Facilitator-1. In total, Taqi contributed approximately $3,449.35 to Facilitator-1 through cryptocurrency, PayPal, and GoFundMe.

Taqi has also explicitly expressed support for ISIS. On or about January 22, 2022, Taqi and CHS-1 discussed U.S. troops' involvement in retaking a prison that ISIS had taken control of in northeastern Syria, and Taqi stated, "All we really need is maybe like 100,000 fighters and biidhnillah [if Allah wills] the Muslims could conquer the world cause most of our enemies are cowards," and "If dawlah can get a strong hold in the Middle East fully secure the puppet states ruling of the Muslims would fall like dominoes." On or about February 3, 2022, ISIS's leader Abu Ibrahim al Hashimi al Quarayshi was killed in Syria when he detonated an explosive device during a U.S. special operations raid to kill or capture him. When CHS-1 and TAQI discussed the reporting of al Quarayshi's death, TAQI stated, "If its true, may Allah grant him thr highest rank in Jannah," referring to paradise or the afterlife.

That Taqi repeatedly sent funds to Facilitator-1 through at least three different payment methods and expressly supported ISIS demonstrates that he would pose both a danger to the community and a risk of flight and should be detained pending trial to ensure the safety of the community.

B. The Weight of the Evidence

The weight of the evidence in this case is substantial. The defendant contributed funds to Facilitator-1 through a variety of mediums: he sent funds to a Bitcoin wallet for Facilitator-1; he sent funds to Facilitator-1 through PayPal and GoFundMe; he admitted to CHS-1 that he contributed funds to Facilitator-1; and Facilitator-1 confirmed that the defendant provided him with funds regularly over two years. Additionally, these facts are all supported by documentary evidence from cryptocurrency exchanges, GoFundMe, and PayPal. Accordingly, the evidence of Taqi's guilt is both varied and strong.

C. Taqi's History and Characteristics and The Danger to the Community Posed by His Release

Taqi's history and characteristics confirm he presents a risk of danger to the community and serious risk of flight.

First, as noted above, Taqi has a history of expressing his support for ISIS, and he made payments over a two-year period to Facilitator-1, who conveyed that he was providing money to ISIS fighters. Taqi also attempted to further support ISIS by connecting CHS-1 to Facitlator-1 so that CHS-1 could give money to support ISIS and by vouching for CHS-1 with Facilitator-1.

Second, like Hashimi, Taqi faces significant punishment for the charged crime, specifically a 20-year statutory maximum and a Guidelines range that exceeds the 240 month statutory maximum sentence. The significant penalty Taqi faces weighs strongly in favor of detention.

10

The above facts demonstrate that Taqi supports ISIS and consistently sent funds to Facilitator-1, who in turn, stated he was providing that money to ISIS. Additionally, Taqi has made statements to CHS-1 indicating his knowledge of the seriousness of his offense. On or about May 20, 2022, he stated to CHS-1, "The reason I have stopped sending at least for now is because the bank where I had an account which I used to buy bitcoin and send sadaqah randomly force closed down my account last month and they didn't give me a reason why they did. So I thought it is better to lay low for a while cause I dont know if they shut my account down cause they suspected me of funding or something."

That Taqi understands the seriousness of his offense, and yet vouched for CHS-1 to Facilitator-1 and vice versa, confirms that Taqi would pose an acute danger to the community if released. Consistent with the Bail Reform Act, he must be detained pending trial to ensure the safety of the community.

**Seema Rahman**

    A.    <u>The Nature and Circumstances of the Offense Charged</u>

Rahman also played an integral role in the criminal conspiracy. Rahman gave more than $11,000 to Facilitator-1 to support ISIS, collecting and contributing this money in three different ways:

<u>First</u>, in April and May 2021, Rahman contributed approximately $550 to Facilitator-1's PayPal account.

<u>Second</u>, Rahman created two GoFundMe fundraisers in which she raised money for individuals connected to Facilitator-1. As she raised the money, she also made wire transfers through Western Union to those individuals. Specifically, on or about May 26, 2021, Rahman created a GoFundMe fundraiser titled "Help Rebuild Umm Mohammed's Home." Umm Mohammed is a reference to Facilitator-1. Between June 4, 2021 and October 14, 2021, Rahman transferred approximately $4,822 from the GoFundMe fundraising campaign to her own bank account. On or about October 10, 2021, Rahman created a second GoFundMe campaign that was also intended to raise funds for Umm Mohammed, titled "Help Umm Mohammed Pay for Medical Treatment." Rahman transferred the proceeds from these fundraising campaigns to a bank account in her own name. Specifically, between November 10, 2021 and April 20, 2022, Rahman transferred approximately $4,544 from the GoFundMe fundraising campaign to her bank account. Around the same time, between June 7, 2021 and June 14, 2022, Rahman sent $10,024 over 15 transactions to individuals who connected to Facilitator-1, including an individual who used the same address as Facilitator-1 and a second individual in the same geographic area with the same last name as Facilitator-1. Notably, in response to questions from GoFundMe about the recipients of one of his GoFundMe campaigns, Yousuf told GoFundMe that the beneficiaries of the campaign were two individuals who were the same two individuals to whom Rahman wired money via Western Union. Moreover, although the GoFundMe campaigns that Rahman created purport to be for humanitarian causes ("Rebuild Umm Mohammed's Home" and "Help Umm Muhammed

11

Pay for Medical Treatment"), Umm Mohammad (i.e., Facilitator-1) was in June 2022 telling a confidential source that a similar GoFundMe that was created by Yousuf and that purported to raise money for needy families for Eid was in fact fake and intended to deceive because the money was in fact for "the Mujahideen" (i.e., ISIS fighters) and "for jihad."

Third, between June 2021 and February 2022, over the same time frame that Rahman was raising and contributing money via GoFundMe and Western Union to individuals associated with Facilitator-1, Rahman contributed nearly $1,000 to Facilitator-1's Bitcoin wallet over nine transactions from her cryptocurrency account.

Communications obtained pursuant to search warrants show Rahman advising others about making hijrah and contributing money to support ISIS. In a conversation with another individual (Individual-1) in December 2020, Rahman advised Individual-1 on how to make hijrah, including that Individual-1 would need "tazkiya," or someone vouching for that person, in order to make hijrah. Individual-1 said Individual-1 had "tazkiya" from "green birds," which is a term used by jihadists to eulogize their fallen members. Rahman counseled Individual-1 that "ikhwa [brothers] don't accept tazkiya except from someone who is alive and able to vouch for u." Rahman advised, "Tazkiya is important and it's their right to be careful about new people they choose to let to work with them because we have to be wise so that we dont fall into the same holes again." When Individual-1 asked about going to Yemen, Rahman stated, "The only thing is akhi [friend/brother] the brother told me Yemen and iraq specifically do not accept anyone without tazkiya." Rahman recommended that Individual-1 travel to Egypt because Egypt would accept Individual-1 without tazkiya. These communications show that Rahman was knowledgeable about requirements to travel to join ISIS in multiple countries and was in a position to advise others about how to do so.

Rahman's conversation with Individual-1 also revealed her efforts to raise money for ISIS. After Rahman advised that Individual-1 would need tzakiya, Individual-1 sought tazkiya from Rahman based on having worked with Rahman "in sending $ to this sis." When Individual-1 commented that many had been arrested for sending money to Syria, Rahman stated that "Akhi [friend/brother] we have hand to hand trustworthy ways." Rahman advised Individual-1 to wait a year before making hijrah and, in the meantime, to gather money from people to send to the "wilayat" or state. Rahman noted that if Individual-1 nevertheless tried to travel, "it's possible if u leave the authorities will harm your family and [p]ut restrictions on them but this is the price many paid in[] return for jihad." Rahman stated in back in 2014, the whole dunya [world] was able to make hijrah, but that led to spies coming in, so "we don't accept people like that," i.e., without tazkiya. Rahman wrote: "So everyone has to be patient and make dua for this state" "And let the brothers on the ground do what they have to do until Allah opens up for us" "The best way to help now is financially."

In numerous other conversations on the same social media platform, Rahman sought repeatedly to raise money from individuals with whom she communicated, and sought to brainstorm ideas for how to raise money from unsuspecting individuals.

Rahman's communications with her co-conspirators also demonstrate her knowledge of the seriousness of her offense. Rahman exchanged communications with Hashimi in which Rahman stated or implied that she wanted to make hijrah, that she did not "want to go to jail," and that she had incriminating communications on an electronic communication service platform.

Specifically, in August 2021, when Rahman and Hashimi discussed the fact that Rahman wanted to visit a defendant at Rikers Island in New York City who was charged with New York State terrorism offenses by the Manhattan District Attorney, Hashimi warned Rahman that any contact with the defendant would be monitored and that visiting him would jeopardize Rahman's chances of making hijrah.

In August and September 2021, Rahman and Hashimi exchanged direct messages in which they discussed that Rahman's parents were concerned about her activities, including Rahman's online review of materials supporting terrorism by extremist preacher Sheikh Ahmad Musa Jibril. When Rahman reported to Hashimi that her father was threatening to report both of them, Hashimi encouraged Rahman to keep his name out of it and to lie to protect him. Rahman responded, "I obviously don't want to go to jail either."

Later in September 2021, Rahman reported to Hashimi that her parents had looked at her email and her bank account and that her father was threatening to kick her out because "I am a terrorist to them." Rahman told Hashimi that "[t]he real incriminating stuff is on" an encrypted electronic messaging platform, which her parents apparently would not be able to access. Rahman's statement appears to acknowledge that she engaged in incriminating communications. Indeed, review of search warrant returns for social media accounts for Rahman show that in numerous conversations over social media platforms, Rahman referred others to message her on the encrypted electronic communications platform, which was the same platform that she stated to Hashimi that the incriminating messages were located.

Moreover, results of search warrants on accounts belonging to Rahman revealed that she had searched for and reviewed significant ISIS propaganda. For example, on or about July 25, 2021, Rahman registered an account on the Internet Archive (archive.org) under the username "puredeen." Using that account, Rahman "favorited" various users and media, including "KHALIFAH: SURVIVE AND REVIVE," which has as its profile picture an image of an ISIS flag and appears to be a reference to a "remaining and expanding" slogan popularized by ISIS supporters online.

On or about September 24, 2021, Rahman emailed to herself extremist jihadist and ISIS content that included a 2013 issue of Inspire magazine, a 2014 collection of biographies of martyrs in Syria, and a 2016 ebook called "Black Flags from the Islamic State. Rahman subsequently deleted the emails from her account. On or about October 16, 2021, Rahman emailed to herself links to works by extremist preachers Sheikh Faisal, Ahmad Musa Jibril and Anjem Choudary, among others. A search of an iCloud account belonging to Rahman also revealed contact information for Jibril and Choudary in Rahman's contacts.

13

That Rahman viewed ISIS media propaganda, hid her true beliefs from her parents but expressed them to her co-conspirator Hashimi, and raised and contributed more than $11,000 to Facilitator-1 demonstrates that she would pose both a danger to the community and a risk of flight and should be detained pending trial to ensure the safety of the community.

B.  The Weight of the Evidence

The weight of the evidence in this case is overwhelming. Rahman's contributions to Facilitator-1 are supported by extensive documentary records, including records of cryptocurrency transactions and records from PayPal, GoFundMe and Western Union. Numerous communications by Rahman were obtained and preserved through search warrants on her social media accounts, and her communications with her co-conspirator Hashimi through direct messages have been captured and preserved as well.

C.  Rahman's History and Characteristics and the Danger to the Community Posed by Her Release

Rahman's history and characteristics confirm that she presents a risk of danger to the community and risk of flight.

Rahman is a 25-year-old female who lives with her parents at their residence in Edison, New Jersey. Despite living with her parents, and despite the concerns that her parents have repeatedly expressed about the individuals she associates with and the activities in which she engages, Rahman has participated fully in the charged conspiracy even while living under her parents' watchful eyes. For example, in August 2021, Rahman told Hashimi that Rahman's father was threatening to report her and Hashimi because he had discovered Rahman viewing the lectures of Sheikh Ahmad Musa Jabril, an Arab-American preacher who provides a religious justification for jihad and has been commonly cited as a radicalizing force for Westerners fighting in Syria, and believed that Hashimi was responsible for radicalizing Rahman. Again in September 2021, Rahman reported to Hashimi that her father was threatening to kick her out of the home because they had reviewed her email and bank accounts and that "I am a terrorist to them." Despite this conflict with her parents, they neither reported her, kicked her out of the house, nor took any action that prevented Rahman from continuing to participate in the charged conspiracy.

In addition, Rahman has opened and deleted numerous accounts on social media platforms. The government's investigation has shown that Rahman has at least five different email accounts and at least five different Meta accounts.

Thus, Rahman's conduct has been characterized by extreme secrecy, in which she has opened and deleted and opened multiple social media accounts, and operated within the charged conspiracy even under the watchful eyes of her parents, keeping her incriminating communications on an encrypted electronic communications service that she believed her parents could not access.

Danger to the community includes the prospect that an individual released on bail would continue to engage in criminal activity while on pretrial release. Here, there is little reason

to think Rahman would abide by any release conditions. Even when her parents discovered, at least to some extent, her conduct, Rahman did not reform or stop engaging in the criminal scheme. Rather, she sought advice from her co-conspirator Hashimi, who encouraged her to lie to her parents to protect both of them, and from the same extremist preacher whose lectures had triggered her parents' concerns in the first place.

Moreover, the extreme secrecy which has characterized Rahman's participation in the conspiracy would make it difficult to ensure that Rahman does not engage in further criminal activity associated with the charged conspiracy while on pretrial release. Accordingly, Rahman's release would continue to pose a danger to the community. It would also pose a risk of flight, as Rahman as previously expressed the desire to make hijrah, i.e., travel to ISIS-controlled territories. Facing the prospect of a significant sentence would no doubt encourage Rahman to pursue that hijrah before she received any significant term of imprisonment. Like Hashimi and Taqi, Rahman's offense carries a 20-year statutory maximum sentence and an advisory Guidelines range of 360 months' custody to life imprisonment, which would be constrained by the 240-month statutory maximum sentence.

For all these reasons, the government respectfully submits that there is no condition or combination of conditions that would permit Rahman's release on bail.

IV. Conclusion

The defendants are charged with serious crimes that carry a presumption of detention, the evidence against them is overwhelming, their history and characteristics give no confidence that they will follow the law or abide by release conditions, and the secrecy of their conduct over a period of years would make it difficult to ensure that they do not continue to engage in similar conduct if released. Accordingly, the government respectfully submits that no condition or combination of conditions can assure the safety of the community, the defendants' return to court, or compliance with the Court's directives, and the Court should thus enter permanent orders of detention pending trial.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/
Douglas M. Pravda
Ian C. Richardson
Nina C. Gupta
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (by ECF)